**WINSTON–SALEM PRINTING PRESS-
MEN AND ASSISTANTS' UNION
NO. 318, Appellee,**

v.

**PIEDMONT PUBLISHING COMPANY
OF WINSTON–SALEM, Appellant.**

**No. 11475.**

United States Court of Appeals
Fourth Circuit.

Argued Dec. 7, 1967.

Decided March 1, 1968.

W. P. Sandridge, Winston-Salem, N. C., (Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., on brief) for appellant.

John S. McLellan, Kingsport, Tenn., (Shelburne Ferguson, Jr., Kingsport, Tenn., and Bradley J. Cameron on brief) for appellee.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

Piedmont Publishing Company appeals from the District Court's order that it submit to arbitration a dispute concerning the terms of a prospective collective bargaining agreement.

The Company and the Winston-Salem Printing Pressmen and Assistants' Union No. 318 entered into a contract, effective as of April 13, 1964, containing a detailed arbitration procedure,[1] and providing:

"Section 15

"This agreement shall continue to and including the 31st day of October, 1965, except that either party on thirty

---

1. "Section 1

"The parties hereto will settle any and all differences affecting wages, hours, working conditions, and shop practices that may arise between them, by conciliation; and if conciliation fails, then

days' notice prior to November 1, 1964, may reopen the agreement for the consideration of wage adjustment only.

"Should either party desire to negotiate for changes in any or all of the provisions of this contract as of November 1, 1965, written notice to the effect must be given to the other party on or before September 1, 1965, together with a written statement in detail of the changes desired. Otherwise, this agreement shall continue from November 1 through October 31 from year to year and can be changed only by mutual consent or through negotiations started by written notice of one of the parties to the other, on or before September 1st of any succeeding year. Should either party propose such amendments or a new contract, and an agreement proves impossible, the difference or differences shall be arbitrated as herein provided."

By letter dated August 30, 1965, the Union gave notice of its desire to make changes and add new provisions to the contract. Collective bargaining sessions were then conducted on September 29, December 2 and December 3, but no final agreement was achieved. The apparent stumbling block was a "manning provision" not included in the original contract. Concluding that an impasse had been reached, the Union informed the Company on December 7, 1965, of its intention to submit the issue to arbitration. The Company refused, advising the Union that it considered the contract expired as of October 31, 1965, and that it was therefore no longer obligated to arbitrate.

The Union thereupon instituted this action under section 301 of the Labor Management Relations Act, 61 Stat. 156, 29 U.S.C.A. § 185,[2] for damages and to compel the Company to arbitrate the unresolved differences as provided in their collective bargaining agreement. Each party filed a motion for summary judgment and, after oral argument, the District Judge granted the Union's motion, obligating the Company to arbitrate, but he awarded no damages.

The Company challenges the order on two grounds. It contends that the court lacked jurisdiction to compel arbitration under a contract which, by its own terms, had terminated. The Company also maintains that regardless of the terms of the contract, the courts are precluded from commanding what has come to be

---

by arbitration, as provided below:

"A standing committee of * * * representatives selected by the Publisher * * * and * * * the Union * * * shall be appointed * * *. To this committee shall be referred all disputes which may arise as to the scale of wages hereto attached, the construction to be placed upon any clause of this agreement, or alleged violations thereof, which cannot be settled otherwise. * * * Should the joint committee be unable to agree, then it shall refer the matter to a Board of Arbitration * * *.

"Section 14

" * * * Both parties recognize that their respective rights under this agreement will have been accorded by the performance and the fulfillment of the terms and conditions of said agreement, and that the complete obligation of each to the other is expressed herein. Under all circumstances, the terms of this agreement are paramount."

2. "(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this Act and any employer whose activities affect commerce as defined in this Act shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

known as "interest" or "prospective" or "quasi-legislative" arbitration.[3]

Arguing that a court cannot compel either party to arbitrate the terms of a new contract, the Company relies almost exclusively on Judge Wyzanski's opinion in Boston Printing Pressmen's Union v. Potter Press, 141 F.Supp. 553 (D.Mass.1956), aff'd, 241 F.2d 787 (1 Cir. 1957), cert. denied, 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34 (1957). Although the issue confronting this court is precisely the same as that raised in the *Potter Press* case, we are convinced that, in the light of what we believe to be the teachings of more recent Supreme Court opinions, *Potter Press* no longer represents an accurate interpretation of section 301 and, for reasons to be stated, we do not follow it.

When writing that opinion, Judge Wyzanski was confronted with the Supreme Court's observation in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 447, 75 S.Ct. 488, 494, 99 L.Ed. 510 (1955) that "[t]he aim [of section 301] was to open the federal courts to suits on agreements solely because they were between labor organizations and employers *without providing federal law for such suits.*" (Emphasis added.) He therefore concluded that section 301 was merely jurisdictional in nature and declined to hold an arbitration clause enforceable under that section. Finding the necessary substantive law in the United States Arbitration Act, 9 U.S.C. §§ 1–14 (1955), the Judge said,

"[A]ssuming the constitutionality of a statute which would authorize federal courts to enforce legislative awards of arbitrators, I nonetheless conclude that the present United States arbitration statute does not seek to reach that constitutional limit, but is concerned only with the enforcement of quasi-judicial awards directed at the ascertainment of facts in a past controversy and at the prescription of recoverable damages or other suitable awards for that which has been broken not for that which is to be built."

141 F.Supp. 557–558. While the First Circuit wholeheartedly endorsed the District Court's conclusion that section 301 was merely jurisdictional and that the appropriate substantive law was to be found in the United States Arbitration Act,[4] a number of circuits, including our own, found substantive rights encompassed in section 301(a).[5] Still other circuits refused to find the necessary substantive rights in either section 301 or the United States Arbitration Act, thereby granting a forum but no remedy.[6]

---

3. These terms refer to the submission to arbitration of provisions of a new contract. See Fleming, Reflections on the Nature of Labor Arbitration, 61 U.Mich. L.Rev. 1245, 1254–1258 (1963); Note, Quasi-Legislative Arbitration Agreements, 64 Colum.L.Rev. 109 (1964).

4. Local 205, United Electrical, Radio and Machine Workers of America (UE) v. General Electric Company, 233 F.2d 85 (1 Cir. 1956), aff'd, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957); Boston Printing Pressmen's Union v. Potter Press, 241 F.2d 787 (1 Cir. 1957).

5. Signal-Stat Corp. v. Local 475, 235 F.2d 298, 300 (2 Cir. 1956); Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 210 F.2d 623, 625 (3 Cir. 1954); Textile Workers Union of America v. Arista Mills, 193 F.2d 529, 533 (4 Cir. 1951); Milk & Ice Cream Drivers, etc. v. Gillespie Milk Prod. Corp., 203 F.2d 650, 651 (6 Cir.

1953); United Electrical, R. & M. Workers of America v. Oliver Corp., 205 F.2d 376, 384–385 (8 Cir. 1953); Schatte v. International Alliance, 182 F.2d 158, 164 (9 Cir. 1950).

6. Lincoln Mills of Ala. v. Textile Workers, 230 F.2d 81 (5 Cir. 1956), rev'd, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); United Steelworkers of America v. Galland-Henning Mfg. Co., 241 F.2d 323, 327–328 (7 Cir. 1957).

The reluctance of these circuits to rely on the United States Arbitration Act stemmed from the exclusionary clause of section 1 of that Act which provided, "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or other class of workers engaged in foreign or interstate commerce," and which was interpreted as excluding collective bargaining agreements. Lincoln Mills of Ala. v. Textile Workers, 230 F.2d 81 (5 Cir. 1956).

In an effort to resolve this divergence, the Supreme Court, in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 450–451, 77 S.Ct. 912, 914–915, 1 L.Ed.2d 972 (1957), sanctioned what it declared to be the majority view: [7]

> "[T]hat § 301(a) is more than jurisdictional—that it authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements."

Concluding that section 301(a) is more than procedural, the Court went on to instruct lower courts that

> "the substantive law to apply in suits under § 301(a) is *federal law, which the courts must fashion from the policy of our national labor laws. * * ** The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. *The range of judicial inventiveness will be determined by the nature of the problem.*" (Emphasis added.)

353 U.S. at 456–457, 77 S.Ct. at 918 (1957).

By directing the courts to look to the national labor policy as embodied in federal legislation and judicial decisions when constructing remedies under section 301(a) the Court in *Lincoln Mills* substantially eroded the foundation of *Potter Press.* A more direct attack on the First Circuit's position came in the companion case of General Electric Co. v. Local 205, United Electrical, Radio and Machine Workers of America (UE), 353 U.S. 547, 548, 77 S.Ct. 921, 922, 1 L.Ed. 2d 1028 (1957). There the Court stated:

> "[The First Circuit] * * * held that while § 301(a) of the Labor Management Relations Act of 1947 gave the District Court jurisdiction of the cause, it supplied no body of substantive law to enforce an arbitration agreement governing grievances. But it found such a basis in the United States Arbitration Act, which it held applicable to these collective bargaining agreements. It accordingly reversed the District Court judgment and remanded the cause to that court for further proceedings.
>
> "We affirm that judgment and remand the cause to the District Court. *We follow in part a different path than the Court of Appeals,* though we reach the same result. As indicated in [Lincoln Mills, supra,] we think that § 301(a) furnishes a body of federal substantive law for the enforcement of collective bargaining agreements * * *." (Emphasis added.)

Following the direction of the Court in *Lincoln Mills,* we turn our attention to the congressional labor statutes and the relevant Supreme Court pronouncements in order to glean the national labor policy from which to fashion an appropriate remedy. By empowering the courts to enforce collective bargaining agreements under section 301, Congress sought to "promote a higher degree of responsibility upon the parties to such agreements, and * * * thereby promote industrial peace." S.Rep. No. 105, 80th Cong., 1st Sess. 17. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Thus, it is clearly the policy of our national labor legislation to encourage both labor and management to negotiate contracts that

---

**7.** It is interesting to note the prescience of Judge Wyzanski, whose opinion in Textile Workers Union of America v. American Thread, 113 F.Supp. 137 (1 Cir. 1953) was cited by the Supreme Court as "[p]erhaps the leading decision representing [the overwhelming majority] point of view." *American Thread* was written almost four years before *Lincoln Mills.*

will effectively regulate every aspect of their complex relationship. More than merely enumerating the specific terms of the existing relationship, the mature contract also provides an internal mechanism for the peaceful solution of all disputes. United Steelworkers of America v. Warrior & Gulf Nav. Co., supra at 580, 80 S.Ct. 1347. In such cases, the Act specifically provides that the desirable method for resolving disputes is the "method agreed upon by the parties" themselves. Section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d).[8] This policy "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 566, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960).

Equally significant, in determining national policy, are the recent decisions of the Supreme Court in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962) and the *Steelworkers* trilogy, supra, which we read as not only recognizing arbitration as an acceptable method of resolving labor disputes, but actively encouraging it.[9] As Mr. Justice

Harlan stated, "[t]his Court has in the past recognized the central role of arbitration in effectuating national labor policy. * * * The preference of national labor policy for arbitration as a substitute for tests of strength between contending forces could be overcome only if other considerations compellingly so demand." John Wiley & Sons, Inc. v. Livingston, supra at 376 U.S. 549–550, 84 S.Ct. at 914.

No compelling reason for disregarding the specific provision to arbitrate a new contract in the instant case has been brought to our attention. The Company argues that if courts enforce this type of arbitration, "there would never be and there could never be an end to this contract." The Company, professing solicitude for the employees vis-a-vis the Union, further insists that under the District Court's ruling, "the printing and pressmen employees of the Company are bound to this Union with hoops of steel which deprive them forever of the right to terminate this Union as their bargaining representative." Neither argument is persuasive nor do they together outweigh what we conceive to be the national labor policy of strictly enforcing collective bargaining agreements and thereby compelling the parties to resolve peacefully all labor disputes by their previously agreed method.

Contrary to the Company's assertions, the contract will surely end when both

8. This same policy is embodied in section 201(b) of the Act. 29 U.S.C. § 171(b).
   "(b) the settlement of issues between employers and employees through collective bargaining may be advanced by making available full and adequate governmental facilities for conciliation, mediation, and voluntary arbitration to aid and encourage employees and the representatives of their employees to reach and maintain agreements concerning rates of pay, hours, and working conditions, and to make all reasonable efforts to settle their differences by mutual agreement reached through conferences and collective bargaining or *by such methods as may be provided for in any applicable agreement for the settlement of disputes*." (Emphasis added.)

9. "Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties.
   * * * * *
   "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 581–583, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960).

parties agree to terminate it and in some instances when either of the original signatories is removed from the scene. See John Wiley & Sons, Inc. v. Livingston, supra at 551–555, 84 S.Ct. 909; Cox and Bok, Cases and Materials on Labor Law, 314–317 (6th ed. 1965). Then too, as the material referred to in Cox and Bok indicates, the employees are not bound "with hoops of steel" but can, upon the filing of a timely petition within the guidelines of the "contract bar rules," designate a new bargaining representative.

The second point is, we believe, the more significant of the two. As long as employees retain their full freedom to choose or dismiss their bargaining representative, it is immaterial that the contract might be of indeterminate duration —if that is what the parties bargained for. We must assume that either the parties mutually agreed on this provision from the start or that one of the parties secured it during the give and take of the collective bargaining. In either case, as long as it is not against the national labor policy, which it certainly is not, it is entitled to enforcement along with any other provision agreed upon by the parties.[10] Nothing would be more out of step with our national labor policies than for courts to refuse to enforce a voluntary agreement to arbitrate differences.

■■ A provision to arbitrate when agreement upon a new contract proves impossible, as is the case here, is part of an existing agreement and refusal to comply therewith constitutes a breach. This court is not asked to determine the provisions of a new contract or to perform any non-judicial function. The drawing of the new contract will be in the hands of an arbitrator where the parties chose to place the authority and responsibility. The court is asked to do no more than enforce a provision of an existing contract, a traditional judicial function.

While the Company refers the court to a number of recent decisions affirming the holding in *Potter Press*,[11] these cases are entitled only to the remaining force and validity underlying the rationale of Judge Wyzanski's opinion. More persuasive are the reasoning and conclusions of the opinions,[12] equal in number, challenging the statutory predicate of *Potter Press* in light of more recent Supreme Court decisions, supra. We cast our lot with the latter group.

■■ The question still to be resolved, however, is whether the collective bargaining agreement provided a proper basis for compelling the employer to submit the terms of a *new* contract to arbitration. Since the duty to arbitrate is "of contractual origin, a compulsory

10. Although the point is not raised by the Company, some skeptics have suggested that the arbitration of new contracts is unrealistic and unworkable. Our research indicates that quite the opposite is the case. Arbitration of the terms of new contracts preceded the now commonplace grievance arbitration, Witte, Historical Survey of Labor Arbitration (1952), and has been successfully employed in the transit and printing industries for a substantial period of time. Kuhn, Arbitration in Transit (1952); Loft, The Printing Trades (1956). For other examples of successful prospective arbitration see Handsaker, Changing Role of Arbitration and Changing Issues. N.Y.Univ. 14th Annual Conf. on Labor 186–189 (1961).

11. International Typographical Union Local No. 21 v. San Francisco Newspaper Printing Co., 247 F.Supp. 963 (N.D.

Cal.1965); Austin Mailers Union No. 136 v. Newspapers, Inc., 226 F.Supp. 600 (W.C.Tex.1963), aff'd, 329 F.2d 312 (5 Cir. 1964), cert. denied, 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 753 (1964); In re Valencia Baxt Express Co., 199 F. Supp. 103 (D.Puerto Rico 1961); Couch v. Prescolite Manufacturing Corp., 191 F.Supp. 737 (W.D.Ark.1961).

12. Division No. 892, etc. v. M. K. & O. Transit Lines, 210 F.Supp. 351 (N.D. Okl.1962), reviewed on other grounds, 319 F.2d 488 (10 Cir. 1963), cert. denied, 375 U.S. 944 (1963); Builders Association of Kansas City v. Greater Kansas City Laborers, 326 F.2d 867 (8 Cir. 1964), cert. denied, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964); Seltzer & Co. v. Livingston, 253 F.Supp. 509 (S.D.N.Y.1966), aff'd, 361 F.2d 218 (2 Cir. 1966).

submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty." John Wiley & Sons, Inc. v. Livingston, supra at 376 U.S. 547, 84 S.Ct. 913. The role of the court in actions brought under section 301 is strictly limited to ascertaining "whether the party seeking arbitration is making a claim which on its face is governed by the contract." United Steelworkers of America v. American Mfg. Co., supra at 363 U.S. 568, 80 S.Ct. 1346.

A reading of the relevant provisions of the contract negotiated in the instant case, discloses that the parties clearly envisioned submitting to arbitration the terms of a new contract.[13] The Company argues, however, that the contract expired on October 31, 1965, thereby relieving it of its duty to arbitrate. Rejecting this contention, the trial court reasoned that:

> "[t]he parties evidently envisaged a continuing contractual relationship with periodic negotiations to make desired changes in the basic contract. * * * Arbitration was established as the terminal step in implementing such changes after negotiated agreement proved impossible. Consequently a bargaining impasse was made a condition precedent to the invocation of the arbitral process. * * * The contract did not state that notice to arbitrate must be given before [a] certain date. The contract simply stated that should agreement prove impossible then the differences shall be arbitrated. * * * When changes in the basic contract were requested and negotiations begun, the contract, by its own terms, remained in existence until all differences were settled and this settlement included arbitration, if necessary."

■ This court intimates neither agreement nor disagreement with the trial judge's construction of Section 15 of the original contract, for in our view this particular issue involves an interpretation of the contract which should be determined independently by the arbitrator. The contract specifically provides that "the construction to be placed upon any clause of this agreement" is to be resolved through the grievance procedure incorporated therein,[14] and we can see no reason why that provision should not govern the construction to be given Section 15. In support of its position, the Union points out that this type of contract has been employed in the industry for over thirty years. If so, who is better qualified to determine the intent of the parties than an arbitrator chosen because of his knowledge of the customs and practices of the industry?

■ In United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed. 2d 1424 (1960), the Supreme Court observed that the expiration of a collective bargaining agreement does not preclude an arbitrator from determining whether the parties intended the arbitration clause to cover disputes arising before, but not submitted to arbitration until after, the termination date. Having concluded that the parties envisioned arbitration of the terms of a new contract, we hold, consistent with *Enterprise Wheel*, supra, that it is within the province of the arbitrator to determine whether Section 15, properly interpreted, requires that arbitration be requested before the renewal date, as the Company insists, or merely that negotiations be commenced by that date, as the Union argues.

We therefore affirm the order of the District Court requiring submission of the dispute to arbitration.

Affirmed.

---

13. "Section 15
"* * * Should either party propose such amendments or *a new contract*, and an agreement proves impossible, the difference or differences shall be arbitrated as herein provided." (Emphasis added.)

14. See n. 1, supra.